[No. 41714.    En Banc.    July 15, 1971.]

INDEPENDENT INSURANCE AGENTS AND BROKERS OF WASHINGTON, *Appellant*, v. KARL HERRMANN *et al., Respondents.*

*Jones, Grey, Bayley & Olsen,* by *Gene B. Brandzel,* for appellant.

*Slade Gorton, Attorney General,* and *Richard Roth, Assistant,* for respondent Herrmann.

*Lycette, Diamond & Sylvester, John N. Sylvester, William Fisher, Jr.,* and *Thomas J. Chambers,* for respondent Standard National Insurance Company.

STAFFORD, J.—Appellant, Independent Insurance Agents and Brokers of Washington, brought an action to stay the order of respondent, Insurance Commissioner of the State of Washington, which approved an application for the "mass marketing" of casualty insurance by respondent, Standard National Insurance Company. The trial court entered judgment approving the Insurance Commissioner's order, quashed the stay order and dismissed appellant's petition.

The sole issue is whether Standard National's plan for the "mass marketing" of casualty insurance is violative of RCW 48.18.480 which reads in part:

> No insurer shall make or permit any *unfair discrimination* between insureds or subjects of insurance having substantially like insuring, risk, and exposure factors, and *expense elements*, in the terms or conditions of any insurance contract, or in the rate or amount of premium charged therefor, or in the benefits payable or in any other rights or privileges accruing thereunder.

(Italics ours.)

The "mass marketing" of casualty insurance does not create a new product, it merely provides a new method by which an old product may be sold. Under such a plan, personal automobile and homeowner's policies are sold to persons who have available to them a central billing and collection facility provided by membership in some group, such as a union or common employer. Individual rates are established for each insured based on the rating criteria traditionally used, such as the type of home and available fire protection (in the case of homeowner's policies) and the normal use of vehicles, driving records, age of drivers and place of vehicle storage (in the case of automobile insurance). Each person in the group receives an individual policy which includes individual declarations of coverage.

The plan contemplates a reduction of premium as a result of the reduced costs of acquisition and accounting which flow from the economics of group purchasing and the collection of premiums through payroll deduction or similar services. In short, the reduced cost of marketing insurance is passed on, as a saving to the insurance-buying public, in the form of lower premiums.

Appellant contends the Insurance Commissioner's order, which authorizes "mass marketing", is contrary to RCW 48.18.480 because it permits *unfair* discrimination between insureds having substantially like risks. It is said to be unfair to give lower rates to those who belong to a class having facilities available to support a "mass marketing" plan (*i.e.,* membership in a union or employees of a common employer having central billing and collection facilities).

The argument stems from an assumption that the phrase

"expense elements", used in RCW 48.18.480, refers solely to expenses related to the risk characteristics and exposure factors of an insured and the attendant costs related to an accident or loss (*i.e.*, the cost of processing claims, settlements, and legal fees with the consequent effect on the risk characteristics of insureds). These might be denominated more properly as "loss-associated expenses".

■ Appellant urges that the term "expense elements" does not refer to an insurer's expenses incurred in the acquisition or maintenance of policies or in the collection of premiums. It is suggested the designation is almost synonymous with the phrase "risk, and exposure factors" which precedes it in the statute. If appellant is correct, we must assume the legislature's use of the expression "expense elements" was either superfluous or duplicitous. This we may not do. Statutes must be construed so no word, clause or sentence is superfluous, void or insignificant. *Martin v. Department of Social Security*, 12 Wn.2d 329, 121 P.2d 394 (1942). We must refrain from reading into a statute matters which are not there and we must not modify a statute by construction. In construing a statute, words must be given their usual and ordinary meaning. *King County v. Seattle*, 70 Wn.2d 988, 425 P.2d 887 (1967).

■ This being the case, it must be noted that the word "expenses", as used in the insurance industry, has been defined as:

> The cost to the insurer of conducting its business other than paying losses.

L. Davids, Dictionary of Insurance, 102 (1970). The foregoing definition runs counter to appellant's assertion.

We hold that the expression "expense elements" includes an insurer's expenses incurred in the acquisition and maintenance of policies or in the collection of premiums. It does not include its "loss-associated expenses" such as the cost of processing claims, settlements, and legal fees related thereto.

·RCW 48.18.480 *does not prohibit discrimination,* and appellant does not contend it does. In fact, discrimination is

common in the industry (*i.e.*, rates based on age, the miles a car is driven, preferred risk, and the distance a home is located from a fire hydrant). The statute prohibits only *unfair* discrimination when insureds have "substantially like insuring, risk, and exposure factors, and expense elements." RCW 48.18.480.

Thus, the question is not whether there is discrimination between insureds but whether the discrimination in rates or in the amount of premiums is *unfair* in light of the insurer's "expense elements."

In addition to those rate differentials authorized by RCW 48.18.480 for "risk, and exposure factors", RCW 48.19.030 permits an insurer's rates to reflect its particular *method of operation*.

48.19.030 Making of rates—Criteria. Rates shall be used, subject to the other provisions of this chapter, only if made in accordance with the following provisions:

. . .

(2) In the case of casualty and surety insurances:

(a) *The systems of expense provisions included in the rates* for use by any insurer or group of insurers *may differ from those of other insurers* or groups of insurers to *reflect the requirements of the operating methods of any such insurer* or group with respect to any kind of insurance, or with respect to any subdivision or combination thereof for which subdivision or combination separate expense provisions are applicable.

. . .

(4) In addition to other factors required by this section, rates filed by an insurer on its own behalf may also be related to the insurer's plan of operation and plan of risk classification.

(Italics ours.) Logically, an insurer's method of operation includes the manner and means of acquiring new policyholders, the maintenance of existing policies, and the manner of collecting premiums. In short, it includes the insurer's "expense elements", as previously defined. Discrimination based on substantially different "expense elements" is authorized by RCW 48.18.480 and RCW 48.19.030.

The record indicates the largest single cost of oper-

ation is the acquisition of business (*i.e.*, both company costs and agents' commissions). Through "mass marketing" techniques distribution costs for automobile physical damage insurance were reduced from 20 per cent of premium to 11 per cent thereof and distribution costs for automobile liability insurance were reduced from 25 per cent of premium to 11 per cent. Distribution costs of homeowner's insurance were reduced from 33 per cent of premium to 24 per cent. Most of the reduction in costs stemmed from a drastic cut in agents' commissions (*i.e.*, cuts of from 1 to 5 per cent of premium).

"Mass marketing" contemplates passing the results of these economies on to the consumer. It could reflect a rather considerable saving to the insurance-buying public in the form of lower insurance premiums. We agree with the trial court's finding of fact that the benefits of "mass marketing" insurance should be passed on to the insuring public.

There is another reason why we must affirm the trial court's judgment. As required by CR 52, and contemplated by RCW 34.04.130(6), the trial judge made specific findings of fact that the Insurance Commissioner's order did not authorize fictitious or unfair groupings of insured; that the order did not damage the residents of the state by permitting unlawful discrimination among insured; that the order was not in excess of statutory authority; that the order was not arbitrary and capricious; and, that the order was not clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the order. Conclusions of law based thereon were duly entered. Appellant failed to assign error to any finding of fact or to any conclusion of law based thereon.

Although this is an appeal from the judgment of a trial court which affirmed an order of the Insurance Commissioner, it is still governed by the rules on appeal as in other civil cases. RCW 34.04.140. ROA I-43 provides in part:

In appeals from all actions at law **or in equity tried to** the court without a jury the findings of fact made by the

court will be *accepted as the established facts in the case unless error is assigned thereto.*

(Italics ours.)

All pertinent facts were resolved in favor of the Insurance Commissioner's order. The conclusions of law are amply supported by the findings of fact. Thus, we must affirm the trial court.

The judgment is affirmed.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, NEILL, and WRIGHT, JJ., concur.

FINLEY, J. (concurring in the result)—Several erudite law review articles demonstrate—I think quite clearly and convincingly—that each of the many principles or maxims of statutory interpretation and statements paraphrasing these maxims has an opposite and countervailing principle or statement. *See* Llewellyn, *Remarks on Theory of Appellate Decision,* 3 Vand. L. Rev. 395, 401-406 (1950). In the majority opinion several sweeping generalizations are made regarding the interpretation of statutes (by this court). These generalities, at least in part, are attributed—out of context—to the decision in *Martin v. Department of Social Security,* 12 Wn.2d 329, 121 P.2d 394 (1942), and are used in support of the majority's disposition of this appeal.

I am reluctant to cite cases and to quote chapter and verse indicating principles, canons, or maxims of statutory interpretation contrary and countervailing as to those broadly stated by the majority. Although it seems obvious that such cases and quotes could easily be supplied, no purpose would be served by doing so. In any event, for the reasons stated I cannot accept or agree with some of the general statements made without qualification in the majority opinion. Except for this, and because the result is a commonsensical one, in my judgment, considering the facts and circumstances of this case, I do agree with the majority's affirmance of the trial court and have signed the majority opinion on this basis.